**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **Malikie Innovations Ltd. and** | § | |
| **Key Patent Innovations Ltd.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIVIL ACTION NO. 1:25-cv-01826** |
| | § | |
| **Canon Inc. and** | § | **JURY TRIAL DEMANDED** |
| **Canon U.SA., Inc.** | § | |
| | § | |
| **Defendants.** | § | |

**COMPLAINT FOR PATENT INFRINGEMENT AND JURY DEMAND**

Plaintiffs Malikie Innovations Ltd. ("Malikie") and Key Patent Innovations Ltd. ("KPI") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this Complaint for patent infringement and damages against Defendants Canon Inc. and Canon U.S.A., Inc. (collectively, "Canon" or "Defendants") and, in support, allege the following:

**PARTIES**

1.      Plaintiff Malikie is the successor-in-interest to a substantial patent portfolio created and procured over many years by BlackBerry Ltd., formerly known as Research in Motion Ltd., and its predecessor, subsidiary, and affiliated companies (collectively, "BlackBerry"). Malikie is an Irish entity duly organized and existing under the laws of Ireland. Malikie has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

2.      Plaintiff KPI is the beneficiary of a trust pursuant to which Malikie owns, holds, and asserts the Asserted Patents (set forth below). KPI is an Irish entity duly organized and existing under the laws of Ireland. KPI has registered offices at: The Glasshouses GH2, 92 Georges Street Lower, Dun Laoghaire, Dublin A96 VR66, Ireland.

3.    On information and belief, Defendant Canon Inc. is a corporation duly organized and existing under the laws of Japan, with a principal place of business at: 30-2, Shimomaruko 3-chome, Ohta-ku, Tokyo 146-8501, Japan.

4.    On information and belief, Defendant Canon U.S.A., Inc. ("CUSA") is a corporation duly organized and existing under the laws of the State of New York, with a principal place of business at: One Canon Park, Melville, NY 11747.  On further information and belief, CUSA also has a place of business at 12515 Research Blvd., Bldg 7 Suite 110, Austin TX, which is in this district.

5.    On information and belief, Defendants and/or its employees or officers direct and/or control the actions of its direct and indirect subsidiaries.  On information and belief, Defendants and/or its employees or officers direct and/or control the actions of these entities by, for example, inducing and contributing to the actions complained of herein.  Canon and its affiliates are part of the same corporate structure and distribution chain for the making, importing, offering to sell, selling, and/or using of the accused devices in the United States, including in the State of Texas generally and this judicial district in particular.

6.    Canon and its affiliates share the same management, common ownership, advertising platforms, facilities, distribution chains and platforms, and accused product lines and products involving related technologies.

7.    Canon and its affiliates regularly contract with customers regarding products made for or on behalf of those customers.

8.    Canon and its affiliates operate as a unitary business venture and are jointly and severally liable for the acts of patent infringement alleged herein.

## PATENTS IN SUIT

9.      Malikie is the assignee of and owns all right and title to U.S. Patent Nos. 7,747,934 (the "'934 Patent"); 9,218,434 (the "'434 Patent"); 10,484,870 (the "'870 Patent"); 10,003,730 (the "'730 Patent"); 9,143,323 (the "'323 Patent"); and 8,068,698 (the "'698 Patent) (collectively, the "Asserted Patents").

10.     BlackBerry developed numerous innovative and diverse technologies, including groundbreaking inventions pertaining to mobile devices and related software and wireless communications technology.  Some of these groundbreaking inventions are described and claimed in many of the Asserted Patents.

11.     The '934 Patent, entitled "Method for selecting low density parity check (LDPC) code used for encoding of variable length data" was duly and lawfully issued on June 29, 2010. A true and correct copy of the '934 Patent is attached hereto as Exhibit A.

12.     The '434 Patent, entitled "Method for storing media captured using a portable electronic device" was duly and lawfully issued on December 22, 2015. A true and correct copy of the '434 Patent is attached hereto as Exhibit B.

13.     The '870 Patent, entitled "System and method for handling peripheral connections to mobile devices" was duly and lawfully issued on November 19, 2019. A true and correct copy of the '870 Patent is attached hereto as Exhibit C.

14.     The '730 Patent, entitled "Method and device for sharing a camera feature" was duly and lawfully issued on June 19, 2018. A true and correct copy of the '730 Patent is attached hereto as Exhibit D.

15.    The '323 Patent, entitled "Securing a link between two devices" was duly and lawfully issued on September 22, 2015. A true and correct copy of the '323 Patent is attached hereto as Exhibit E.

16.    The '698 Patent, entitled "System and method for resizing images prior to upload" was duly and lawfully issued on November 29, 2011. A true and correct copy of the '698 Patent is attached hereto as Exhibit F.

17.    Malikie sent Canon a letter (addressed to Canon's Group Executive, Corporate Intellectual Property and Legal Headquarters, Canon Inc., Mr. Hideki Sanatake and President & CEO Canon USA, Inc., Mr. Isao Kobayashi) on March 1, 2024 offering a license to Malikie's patent portfolio.  Malikie's letter specifically noted that its portfolio included patents relating to the Wi-Fi 802.11 standard and that Malikie is willing to offer Canon a license on FRAND terms so that it could lawfully continue its use of the patented technologies.  Canon responded on March 25, 2024 requesting claim charts, which Malikie provided on April 9, 2024.   The April 9 correspondence reiterated Malikie's offer to license on FRAND terms.  Between April 12, 2024 and April 15, 2024, Malikie and Canon exchanged several emails related to questions from Canon including allowing Canon to share information with its suppliers.

18.    Malikie then followed up with an email from Kapu Kumar to Abe Daisuke dated May 28, 2024, identifying additional patents, including the '434 Patent, the '870 Patent, and the '698 Patent, as well as claim charts directed towards infringing Canon products and an offer to schedule an introductory call. Canon acknowledged receipt on May 30, 2024.

19.    On June 3, 2024, Malikie provided Wi-Fi Alliance certifications of Canon products to Canon as additional evidence of use.  On July 15, 2024, Canon provided rebuttals to Malikie's patent claims, and on August 15, 2024, Malikie provided sur-rebuttals, additional evidence of use,

and a FRAND licensing offer for its 802.11x/WiFi Alliance patents.  On August 19, 2024, Canon responded and again requested to share information with its suppliers.  On August 26, 2024, Malikie responded reiterating that Canon was permitted to share the information Malikie provided with its suppliers and again requested an introductory call.  On September 27, 2024 and October 11, 2024, Malikie sent emails requesting a status update and asking for an in-person meeting.  On December 17, 2024, Malikie sent another email requesting a status update.  On December 27, 2024, Canon provided rebuttals on additional patent claims from May 28, 2024.  On March 11, 2025, Malikie provided sur-rebuttals to Canon's December 27, 2024 communication and repeated its FRAND licensing offer from August 15, 2024.  On March 27, 2025, Malike requested an in-person meeting in Japan for May 2025, and followed-up on March 31, 2025 with another email. On May 12, 2025, Canon responded that they were still reviewing the materials.  On July 7, 2025, Malikie sent an email requesting an in-person meeting for July 23, 2025, and on July 14, 2025, Malikie followed-up and again offered an in-person meeting for July 23, 2025.  On July 17, 2025, Canon declined the meeting proposal.  On August 20, 2025, Canon provided additional rebuttals. After more than eighteen months of correspondence between Malikie and Canon, Canon has yet to provide a counter to Malikie's FRAND proposal.

20.     Despite Malikie's repeated efforts, including the provision of detailed proposals, to move the negotiations toward a reasonable license agreement, the discussions have not resulted in any meaningful progress.  Canon has continued to make use of Malikie's patented technology without authorization and has not indicated any genuine intent to reach a resolution.  Malikie is therefore left with little choice but to bring this action to enforce its rights as the owner of valid and valuable patents that Canon is willfully infringing.

## WI-FI STANDARD AND PLAINTIFF'S FRAND OBLIGATIONS

21.     The Institute of Electrical and Electronics Engineers ("IEEE") is a professional association whose activities span a broad range of disciplines, including telecommunications. As part of its activities, the IEEE develops and publishes industrial standards, including standards pertaining to wireless communications.

22.     The IEEE-Standards Association (SA) operates within the IEEE and develops global standards in various industries, including Wi-Fi (802.11) standards.  The IEEE 802.11 standards, developed by the IEEE-SA, provide a set of media access control (MAC) and physical layer (PHY) specifications for implementing Wi-Fi.  The IEEE-SA requires participants to commit to abide by their Intellectual Property Rights ("IPR") policies, which set forth the rights and obligations of their members. For example, members are required to disclose intellectual property rights that disclose standard essential and potentially standard essential patents and patent applications relevant to IEEE standards.  Further, the IEEE requires members disclosing IPR to indicate, via a Letter of Assurance ("LOA"), whether they will commit to granting implementer members a license under terms that are Fair, Reasonable, and Non-Discriminatory ("FRAND").

23.     BlackBerry has been an active participant in the IEEE's development of industry standards, including many of the 802.11 standards.  On numerous occasions, BlackBerry notified the IEEE in public LOAs that its patents could include Essential Patent Claims with respect to at least the IEEE 802.11-2102, 802.11k, 802.11mb, 802.11n, 802.11p, 802.11r, 802.11s, 802.11u, 802.11v, 802.11w, 802.11y, 802.11z, 802.11aa, 802.11ad, 802.11ae, and 802.11.2 standards. BlackBerry further indicated that it was willing to grant a license to patents that could include Essential Patent Claims under terms that are FRAND.

24.     As mentioned above, Malikie offered Canon the chance to license its SEPs, including those covering IEEE 802.11 standards that it acquired from BlackBerry, on FRAND terms.  Particularly, Malikie contacted Canon on or about March 1, 2024 to notify it specifically of its infringement of numerous patents, including patents essential to IEEE 802.11 standards and to offer Canon the opportunity to license Malikie's IEEE 802.11 SEPs on terms and conditions consistent with Malikie's FRAND commitments.  Malikie's IEEE 802.11 SEPs includes, among others, the '934 Patent.  On April 9, 2024, Malikie reiterated its willingness to license Malikie's IEEE 802.11 SEP patents to Canon.  Malikie sent additional correspondence to Canon on several occasions, including on or about August 15, 2024 and March 11, 2025, in which it offered a specific FRAND royalty rate for all patents essential to the IEEE 802.11 standards or that otherwise fall within the commitments to IEEE made by the owner of the patents at the time.  In Malikie's March 11, 2025 correspondence, Malikie noted Canon had not responded to Malikie's FRAND offer, and Malikie requested Canon provide its counter FRAND offer or, if Canon did not desire to take a Wi-Fi FRAND license, a clear statement by Canon of its refusal.  Canon never responded to Malikie's request and has never provided a counter FRAND offer.

## JURISDICTION AND VENUE

25.     Plaintiffs incorporate by reference paragraphs 1-24 herein.

26.     This civil action arises under the patent laws of the United States, 35 U.S.C. § 1 *et seq.*, including without limitation 35 U.S.C. §§ 271, 281, 283, 284, and 285.  Thus, this is a patent infringement lawsuit over which this Court has subject matter jurisdiction under, *inter alia*, 28 U.S.C. §§ 1331, 1332, and 1338(a).

27.     This Court has general and specific personal jurisdiction over Canon, due at least to its continuous presence in, and systematic contact with, this judicial district.  Canon is registered

to do business in the State of Texas and is subject to this Court's jurisdiction pursuant to due process at least as a result of Canon's substantial business in Texas and this judicial District, including at least a part of its infringing activities, the regular conductance and soliciting of business at and from its local facilities, and engaging in persistent conduct and deriving substantial revenue from goods and/or services provided in and from Texas, including this District.

28.    This Court has further general and specific personal jurisdiction over Canon because Canon, directly or through intermediaries, including distributors, retailers, and others, has committed and continues to commit acts within this District giving rise to this action by, among other things, making, using, offering for sale, and/or selling products and/or services that infringe one or more of the Asserted Patents.

29.    On information and belief, Canon makes, uses, sells, offers to sell, and/or imports infringing products into and/or within this District, maintains a permanent and/or continuing presence within this District, and has the requisite minimum contacts with this District such that this venue is a fair and reasonable one.  Upon information and belief, Canon has transacted and, at the time of the filing of the Complaint, is continuing to transact business within this District.

30.    Canon purposefully directs or controls the sale of the accused products online and in nationwide retailers and wholesalers, including for sale in Texas and elsewhere in the United States, and expects and intends that the accused products will be so sold in this District.  Canon purposefully places the accused products—whether by itself or through subsidiaries, affiliates, or third parties—into an international supply chain, knowing that the accused products will be sold in the United States, including Texas and in this District. Therefore, Canon also facilitates the sale of the accused products in Texas.

31.     In particular, Canon took and continues to take active steps, directly and/or through contractual relationships with others, with the specific intent to cause such persons to import, sell, or offer to sell the accused products in a manner that infringes the Asserted Patents.  Such steps include, among other things, making or selling the accused products outside of the United States for importation into and/or sale in the United States, or knowing that such importation or sale would occur; and directing, facilitating, or influencing their affiliates, or third-party manufacturers, shippers, distributors, retailers, or other persons acting on its or its affiliates' behalf, to import, sell, and/or offer to sell the accused products in an infringing manner.

32.     Canon utilizes established distribution channels to distribute, market, offer for sale, sell, service, and warrant infringing products directly to consumers and other users in the U.S., including providing links via its website to online stores, retailers, resellers, distributors, and solution partners offering such products and related services for sale.  Such a presence furthers the development, design, manufacture, importation, distribution, sale, and use (including by inducement) of infringing Accused Products in Texas, including in this District.  For example, Canon sells infringing Accused Products at Canon authorized dealers including Canon USA, Inc. 12515 Research Blvd Bldg 7 Suite 110, Austin, TX 78759, and 40 NE Loop 410 Suites G25, G26, G28 San Antonio, TX, Best Buy, BJ's Wholesale, Costco Wholesale, Sam's Club, Staples, Target, and Walmart (*see* https://www.usa.canon.com/order-help/where-to-buy (last visited October 28, 2025, see also Canon U.S.A. Inc. - Authorized Dealers Effective 8/15/25, see also https://l.csa.canon.com/tx/austin/12515-research-blvd.html last visited October 28, 2025).

33.     Plaintiffs' causes of action arise, at least in part, from Defendant's contacts with and activities in and/or directed to this District and the State of Texas.

34.     Venue is proper in this judicial District under 28 U.S.C. §§ 1391(b)-(c) because, among other things, Canon Inc. is a foreign corporation organized under the laws of Japan, with a principal place of business in Japan.  Venue is also proper as to a foreign defendant in any judicial district pursuant to 28 U.S.C. § 1391(c)(3); *In re HTC Corp.*, 889 F.3d 1349 (Fed. Cir. 2018).

35.     Canon is doing business, either directly or through respective agents, subsidiaries, or intermediaries, on an ongoing basis in this judicial District and elsewhere in the United States and have committed acts of infringement in this District.

## **FIRST CLAIM**

### **(Infringement of the '934 Patent)**

36.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1-35 of their Complaint.

37.     The '934 Patent is generally directed to selecting a low-density parity-check (LDPC) code used for encoding variable sized data. The claims of the '934 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

38.     The '934 Patent includes improvements to an existing technological process (e.g., selecting an LDPC code) and improvements to the performance of a computer system itself (e.g., a wireless communication system). For example, the specification discloses: "[o]ne problem when using LDPC codes is a necessity to properly adjust the encoding procedure due to variable payload size and due to variable underlying transmission mechanism. Such encoding procedure typically assumes usage of shortening and puncturing techniques. Furthermore, there may be a plurality of LDPC codes with different codeword lengths and code rates available. The number of the possible combinations may present a challenge to select the appropriate LDPC code to provide a suitable coding gain, and at the same time minimize the number of encoded packets, codewords and

modulated symbols." Exhibit A ('934 Patent) at 1:66-2:9. The '934 addressed these problems through improvements in selecting an LDPC code for variable sized data as disclosed in at least claim 1: "[a] method for selecting a low-density parity-check (LDPC) code used for encoding variable sized data…. encoding data using the selected LDPC code."

39.    The patent teaches another example of an improvement in selecting an LDPC code for variable sized data: "these [known] methods do not directly address the problem described earlier: apply shortening and puncturing in such a way that the code rate is approximately the same as the original one, and the coding gain is preserved. One method attempting to solve this problem specifies shortening and puncturing such that the code rate of the original code is preserved." Exhibit A ('934 Patent) at 7:17-23. The specification discloses how the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code provides a significant improvement to the performance of the wireless communication system at the time of the invention. For example, the specification discloses the advantages of shortening "[i]n the case of a column regular parity check matrix, or more generally, approximately regular or regular and approximately regular only in the data part of the matrix, H, the method described in the previous paragraph is still preferred compared to the existing random or periodic/random approach. The method described here ensures approximately constant row weight, which is another advantage from the performance and the implementation complexity standpoint." Exhibit A ('934 Patent) at 9:57-59. Improvements in selecting an LDPC code using shortening are disclosed in at least claim 1: "calculating a number of shortening $N_{shortened}$ bits for each of the plurality of LDPC codes; … determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes," dependent claim 3: "herein the performance criterion is

selected from the group consisting of … a range of $N_{shortened}$," dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a maximum for $N_{shortened}$."

40.     Another example of the advantages of the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code is disclosed in Exhibit A ('934 Patent) at 10:61-11:1, with reference to the performance curves of Fig. 9: "[a]mong all of those [performance curves], it appears that for the particular matrix structure (irregular $H_d$ part with the modified dual diagonal in the $H_p$ part) the best results are obtained when both criteria [shortened bits and punctured bits] are taken into account, as represented by curves 242, 243, 245, 246. Among all of those, it appears that for the particular matrix structure (irregular $H_d$ part with the modified dual diagonal in the $H_p$ part) the best results were obtained when the punctured bits were selected from those corresponding to the weak columns of the data part of the parity check matrix, $H_d$." Improvements in selecting an LDPC code using puncturing are disclosed in at least claim 1: "calculating a number of puncturing $N_{punctured}$ bits for each of the plurality of LDPC codes; … determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes and the plurality of punctured LDPC codes meeting the performance criterion," dependent claim 3: "wherein the performance criterion is selected from the group consisting of … a range of $N_{punctured}$," dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a minimum for $N_{punctured}$,"

41.     Another example of the advantages of the ordered combination of calculating a number of shortening bits and a number of puncturing bits when selecting an LDPC code is based on a ratio of shortening to puncturing bits. For example, "the shortening-to-puncturing ratio can be chosen such that it guarantees preservation of the performance level of the original code." Exhibit A ('934 Patent) at 11:11-13. Further, the specification discloses that a normalized

shortening to puncturing ratio, $q_{normalized}$ can be used to reduce complexity and preserve performance "if the goal is to preserve performance, this normalized ratio must be greater than one: $q_{normalized} > 1$. It was found through much experimentation that $q_{normalized}$ in the range of 1.2-1.5 complies with the performance preserving requirements." Exhibit A ('934 Patent) at 11:19-23. Improvements in selecting an LDPC code based on a shortening-to-puncturing ratio are disclosed in at least claim 1: "determining, in a computer processor, a selected LDPC code from the plurality of shortened LDPC codes and the plurality of punctured LDPC codes meeting the performance criterion," dependent claim 3: "wherein the performance criterion is selected from the group consisting of…. a range for normalized shortening to puncturing ratio, $q_{normalized}$," and dependent claim 4: "wherein the performance criterion is selected from the group consisting of… a maximum for normalized shortening to puncturing ratio, $q_{normalized}$."

42.    Another example of the significant improvement to LDPC coding methods claimed by the invention is the use of an ordered combination of claim elements to meet a performance criteria "[t]he LDPC codes with different lengths and code rates generally result in a plurality of possible coding options, from which a coding option may be chosen based on the criteria as described above, namely: (a) Keep the performance i.e. the coding gain as high as possible; (b) Use as few modulated symbols as possible; and (c) Keep the overall complexity at a reasonable level." Exhibit A ('934 Patent) at 12:26-34. Criteria (a) "the coding gain as high as possible" results in the improvement of reducing the bit error rate in the wireless communication thereby increasing its efficiency and performance. Criteria (b) results in an improvement in reduced transmit power and increased bandwidth (more bits per second). Criteria (c) results in reduced CPU cycles thereby reducing network latency and increasing battery life. The selection of the performance criteria is based on one or more parameters as recited in claim 3: "wherein the

performance criterion is selected from the group consisting of a range of effective coding rates, a range of basic coding rates, a range of numbers of transmission symbols, a range of $N_{punctured}$, a range of $N_{shortened}$, a range of parity bits in LDPC codewords, a range for normalized shortening to puncturing ratio, $q_{normalized}$, and a combination thereof," and claim 4: "wherein the performance criterion is selected from the group consisting of a minimum effective coding rate, a minimum basic coding rate, a minimum number of transmission symbols, a minimum for $N_{punctured}$, a maximum for $N_{shortened}$, a maximum number of parity bits in LDPC codewords, a maximum for normalized shortening to puncturing ratio, $q_{normalized}$, and a combination thereof."

43.    Defendants have been on notice of the '934 Patent and a specific factual basis for its infringement of the '934 Patent since at least the filing of this complaint.

44.    Canon obtained Wi-Fi 6 Certifications for at least some of its cameras and Wi-Fi products. *See e.g.* Wi-Fi Alliance Certification IDs: WFA128016, WFA130927, and WFA63501.

45.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1, 2, 3, 4, and 10 of the '934 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including devices compliant with IEEE 802.11 standards (excluding any products licensed under the '934 Patent), such as any Canon product using Canon Wi-Fi modules having the following FCC IDs: AZDFM3L998, AZD248, AZDK30387, AZD241, and AZD600.  For example, any Canon printer or camera using Canon Wi-Fi modules having FCC ID AZDFM3L998, AZD248, AZDK30387, AZD241, or AZD600 such as the Canon products identified in Exhibit G.  An exemplary claim chart concerning one way in which Canon infringes claims 1, 2, 3, 4, and 10 of the '934 Patent is attached as Exhibit G.

46.     Defendants have also indirectly infringed, and continues to indirectly infringe, the '934 Patent under 35 U.S.C. § 271(b) and (c).

47.     Defendants have knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claims 1, 2, 3, and 4 of the '934 Patent, and continues to do so, by, for example, selling and offering access to devices compliant with IEEE 802.11 standards. Defendants knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claims 1, 2, 3, and 4 of the '934 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the Accused Products. Canon for example, provides instructions on how to access and use the infringing Wi-Fi features. *See* https://cam.start.canon/en/C008/manual/html/UG-04_Network_0030.html; *see also* Exhibit G.

48.     Defendants have also contributed to the direct infringement of at least claims 1, 2, 3, and 4 of the '934 Patent under 35 U.S.C. § 271(c), and continues to do so, by, for example, supplying, with knowledge of the '934 Patent, a material part of a claimed invention, where the material part is not a staple article of commerce and is incapable of substantial noninfringing use. For example, Canon provides, owns, operates, sells, offers to sell, and/or imports devices compliant with IEEE 802.11 standards (such as that shown in Exhibit G that are not a staple article of commerce and are incapable of substantial noninfringing use.

49.     Canon's ongoing infringement is willful in view of the above and any failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## SECOND CLAIM

### (Infringement of the '434 Patent)

50. Plaintiffs re-allege and incorporate herein by reference paragraphs 1-49 of their Complaint.

51. The claims of the '434 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

52. The '434 Patent is generally directed to a method for updating a media-sharing website. BlackBerry developed the technology in the '434 Patent to solve several technical problems associated with updating a media-sharing website. One such technical problem at the time of the invention was that "[o]ne drawback of both electronic device cameras and stand-alone cameras is that the amount of memory available for photo storage is limited. As a result, users must upload their photos to another storage location frequently in order to free up storage space on the camera." Exhibit B ('434 Patent) at 1:29-33. The '434 Patent further describes the inconvenient media sharing process at the time of the invention. "[i]n order to upload photos from an electronic device including a camera, the photos are first saved on a personal computer and then uploaded to the photo-sharing website by selecting photos from one or more folders on the computer. Alternatively, the photos may be uploaded directly to the photo-sharing website by emailing the photos to an email address associated with the website. Once the photos have been uploaded, they can be organized and stored in albums." Exhibit B ('434 Patent) at 1:34-44. The '434 Patent technological benefits such as "[s]ince these tasks are repeated frequently, it is desirable to reduce the amount of user time spent performing one or more of the steps." Exhibit B ('434 Patent) at 1:53-55.

53. The '434 Patent addressed these problems by "a photo manager that is in communication with the device memory and the account on the photo-sharing website performs a synchronization operation in response to an update prompt. The synchronization operation

includes: synchronizing folder structure between the device 12 and the photo-sharing website and uploading image files from the device 12 to the photo-sharing website. Synchronizing folder structure includes copying folder information from the device 12 to the photo-sharing website and vice versa in order to maintain parallel folder structure therebetween." Exhibit B ('434 Patent) at 5:10-19 and "performing a synchronization operation using a media manager, said media manager being in communication with said device memory and said account on said media-sharing website and using said identity to access said media-sharing website; wherein said synchronization operation synchronizes content between said device memory and said media-sharing website such that said image file is stored in said media-sharing website using said file name" as disclosed in claim 1.

54.     Canon has been on notice of the '434 Patent and a specific factual basis for its infringement of the '434 Patent since at least May 28, 2024.

55.     Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 20 of the '434 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including Canon EOS Series and Powershot Series cameras identified in Exhibit H.  An exemplary claim chart concerning one way in which Canon infringes claims 1 and 20 of the '434 Patent is attached as Exhibit H.

56.     Canon has, under 35 U.S.C. § 271(a), indirectly infringed, and continues to indirectly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 20 of the '434 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software such as the Canon EOS series cameras

and Powershot series cameras. An exemplary claim chart concerning one way in which Canon infringed claims 1 and 20 of the '434 Patent is attached as Exhibit H.

57.    Canon has also indirectly infringed, and continues to indirectly infringe, the '434 Patent under 35 U.S.C. § 271(b) and (c).

58.    Canon has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claims 1 and 20 of the '434 Patent, and continues to do so. Defendants knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claims 1 and 20 of the '434 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the Accused Products. Defendants for example, provide instructions on how to access and use the infringing features. *See* https://image.canon/st/en/camera-email-b.html; *see also* Exhibit H.

59.    Canon's infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## **THIRD CLAIM**

### **(Infringement of the '870 Patent)**

60.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1-59 of their Complaint.

61.    The claims of the '870 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

62.    The '870 Patent is generally directed to a method for establishing a data connection between a peripheral device and a mobile device. BlackBerry developed the technology in the '870 Patent to solve several technical problems associated with securely establishing a data connection

between a peripheral device and a mobile device. One such technical problem at the time of the invention was that "[b]ecause of security reasons and other reasons, typically the connection is to be approved by the device's user before data can be transferred. As an illustration, if the connection is not approved, an attacker could mount the following attack. If the user has a Trojan horse application on their handheld, then an attacker can pickpocket the device, attach a laptop, connect with the Trojan horse application, and then the application can transfer the user's data from the device or inject a rogue application. Accordingly, some type of approval should be used when dealing with peripherals for mobile devices." Exhibit C ('870 Patent) at 1:32-42. The '870 Patent further describes security advantages of the invention. "[t]he chance of a Trojan horse attack is reduced because the attacker also must know the handheld password. It also enhances a mobile device's support for peripherals, because it allows peripherals to be connected that on their own cannot supply the handheld password." Exhibit C ('870 Patent) at 7:5-10.

63.    The '870 Patent addressed these problems by "[i]f the user does not have a handheld password 310 set on their mobile device 100, the user may just be notified that a connection approval is needed and asked to approve the opening of the connection 210 by the peripheral 200, without the user having to supply a password 310." Exhibit C ('870 Patent) at 6:33-37 and "the peripheral provides at step 410 an indication to the mobile device to acquire the user input for allowing the data connection." Exhibit C ('870 Patent) at 6:51-53.

64.    Canon has been on notice of the '870 Patent and a specific factual basis for its infringement of the '870 Patent since at least May 28, 2024.

65.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '870 Patent, by making, using, testing, selling, offering

for sale, and/or importing hardware and/or software including Canon EOS series cameras, XF series cameras, and Powershot series cameras identified in Exhibit I.  An exemplary claim chart concerning one way in which Canon infringes claim 1 of the '870 Patent is attached as Exhibit I.

66.    Canon has, under 35 U.S.C. § 271(a), indirectly infringed, and continues to indirectly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '870 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software such as the Canon EOS series cameras, FX series cameras, and Powershot series cameras. An exemplary claim chart concerning one way in which Canon infringed claim 1 of the '870 Patent is attached as Exhibit I.

67.    Canon has also indirectly infringed, and continues to indirectly infringe, the '870 Patent under 35 U.S.C. § 271(b) and (c).

68.    Canon has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '870 Patent, and continues to do so. Defendants knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claim 1 of the '870 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the Accused Products. Defendants for example, provide instructions on how to access and use the infringing features. *See* https://www.usa.canon.com/mobile-apps/camera-connect; *see also* Exhibit I.

69.    Canon's infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## FOURTH CLAIM

### (Infringement of the '730 Patent)

70.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1-69 of their Complaint.

71.    The claims of the '730 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

72.    The '730 Patent is generally directed to a method for sharing a camera feature. BlackBerry developed the technology in the '730 Patent to solve several technical problems associated with for sharing a camera feature.  One such technical problem at the time of the invention was that "[e]lectronic devices with cameras typically provide a number of camera features which are provided by hardware and software of the electronic devices. For example, such devices sometimes have the ability to zoom, focus on a subject, and trigger a camera flash. Electronic devices sometimes have the ability to perform image processing on a captured image." Exhibit D ('730 Patent) at 1:17-22. The '730 Patent further describes the invention. "[s]uch camera features of electronic devices are typically limited by the hardware and/or software capabilities of the electronic device." Exhibit D (' 730 Patent) at 1:27-29.

73.    The '730 Patent addressed these problems by "[f]or example, a display 204 on a first electronic device 102 may show the field of view of a camera on a second electronic device 104. The first electronic device 102 may allow a user to input an instruction on the first electronic device (e.g. via an input interface 206) to command the first electronic device 102 to capture an image based on camera data generated by a camera of the second electronic device 104. That is, the first electronic device 102 may capture an image based on camera data generated by the second electronic device." Exhibit D ('730 Patent) at 10:16-25. "[i]n the camera-feature-sharing mode, the electronic device 201 (which may be the first electronic device 102 described with reference to FIGS. 1 and 2) is permitted to control a flash of another electronic device 201 (which may be

the second electronic device 104 described with reference to FIGS. 1 and 2)." Exhibit D ('730 Patent) at 10:44-49 "[i]n at least some embodiments, the first electronic device 102 may act as a viewfinder for the second electronic device 104 allowing the user of the first electronic device 102 to observe where the flash is directed." Exhibit D ('730 Patent) at 11:1-5 "if an electronic device is not equipped with facial recognition but another electronic is equipped with facial recognition, then the electronic device which is not equipped with facial recognition may access facial recognition features from the other electronic device." Exhibit D ('730 Patent) at 15:54-57.

74.    Canon has been on notice of the '730 Patent and a specific factual basis for its infringement of the '730 Patent since at least the filing of this complaint.

75.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 6 of the '730 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including the Canon Camera Connect Application ("CCCA"), and Canon cameras compatible with the CCCA, including EOS series cameras, XF series cameras, and Powershot series cameras identified in Exhibit J.  An exemplary claim chart concerning one way in which Canon infringes claims 1 and 6 of the '730 Patent is attached as Exhibit J.

76.    Canon has, under 35 U.S.C. § 271(a), indirectly infringed, and continues to indirectly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 6 of the '730 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software such as the Canon Camera Connect Application, EOS series cameras, XF series cameras, and Powershot series cameras. An exemplary

claim chart concerning one way in which Canon infringed claims 1 and 6 of the ' 730 Patent is attached as Exhibit J.

77.     Canon has also indirectly infringed, and continues to indirectly infringe, the '730 Patent under 35 U.S.C. § 271(b) and (c).

78.     Canon has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claims 1 and 6 of the '730 Patent, and continues to do so. Defendants knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claims 1 and 6 of the '730 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the Accused Products. Defendants for example, provide instructions on how to access and use the infringing features. *See* https://www.usa.canon.com/mobile-apps/camera-connect; *see also* Exhibit J.

79.     Canon's infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## FIFTH CLAIM
### (Infringement of the '323 Patent)

80.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1-79 of its Complaint.

81.     The claims of the '323 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

82.     The '323 Patent is generally directed to generating a cryptographic key used to secure a communication link between a first device and a second device.

83.     BlackBerry developed the technology in the '323 Patent to solve several technical problems associated with securing wireless communications. At the time of the invention

"[v]arious security concerns exist with the use of cryptographic techniques. For example, secrets need to be shared between the two communication devices in a secure and authenticated manner. Especially in the case of mobile devices, it may be desirable to have only those two devices know the secret and not require the intervention/involvement of an Information Technology (IT) administrator. Also, it may be desirable to verify that the devices share a secret without exposing that secret to others, and to use the secret to generate a key to secure a communication link between the devices." (Exhibit E at 1:17-26). BlackBerry directed the improvements to wireless communication security to include "the Institute of Electrical and Electronic Engineers (IEEE) for Wireless LAN MAC and Physical layer (PHY) 802.11a, b, g and n specifications or future related standards." (Exhibit E at 2:2-5).

84.    The '323 Patent solved these problems by the two communication devices "each hash[ing] all the packets sent and received during the generation of symmetric keys K1 and K2 to produce the hash result H. For example, the selected hash function may be applied to the packets as the packets are sent and received, so that this is concurrent with generating the symmetric keys K1 and K2." (Exhibit E at 4:9-14). The two communication devices then "each generate the same symmetric key K3 from K1, K2 and the hash result H. For example, the selected hash function may be used to combine keys K1 and K2 and the hash result H into K3. Symmetric key K3 may then be used to secure communications over communication link 106." (Exhibit E at 4:21-26).

85.    Canon has been on notice of the '323 Patent and a specific factual basis for its infringement of the '323 Patent since at least the filing of this complaint.

86.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continues to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '323 Patent, by making, using, testing, selling, leasing,

licensing, offering for sale, and/or importing hardware and/or software such as Canon DX Series printers including imageRUNNER ADVANCE DX, imagePRESS Lite, imageFORCE, imageCLASS, and MF289dw / MF284dw. An exemplary claim chart concerning one way in which Canon infringed claim 1 of the ' 323 Patent is attached as Exhibit K.

87.    Canon also indirectly infringed, and continues to indirectly infringe, the '323 Patent under 35 U.S.C. § 271(b) and (c).

88.    Defendants knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe, and continues to do so, at least claim 1 of the '323 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the Accused Products. Defendants, for example, instruct customers and users how to securely communicate document data, which infringes the '323 Patent. Defendants for example, provide instructions on how to enable TLS 1.3 on Canon printers, see https://oip.manual.canon/USRMA-0944-zz-CS-5500-enUS/contents/devu-mcn_mng-nw_sec-tls.html.

89.    Canon contributed to, and continues to contribute to, the direct infringement of at least claim 1 of the '323 Patent under 35 U.S.C. § 271(c) by, for example, having supplied, with knowledge of the '323 Patent, a material part of a claimed invention, where the material part was not a staple article of commerce and was incapable of substantial non-infringing use. For example, Defendants provided, owned, operated, sold, offered to sell, leased, and/or imported infringing wireless connectivity in the Accused Products (such as shown in Exhibit K) that were not a staple article of commerce and were incapable of substantial infringing use.

90.    Canon's infringement was willful in view of the above, and their failure to take any action, even after being put on notice, to stop their infringement or inducement of, or contribution to, infringement by others.

## SIXTH CLAIM

### (Infringement of the '698 Patent)

91.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1-90 of their Complaint.

92.    The claims of the '698 Patent are directed to non-abstract ideas and otherwise recite inventive concepts and technological improvements.

93.    The '698 Patent is generally directed to a method for resizing images prior to uploading to an image repository. BlackBerry developed the technology in the '698 Patent to solve several technical problems associated with resizing images prior to uploading. One such technical problem at the time of the invention was that "[r]ecent advances with handheld wireless communication devices have resulted in the introduction of integrated cameras capable of capturing images at a resolution sufficient for many consumer applications. Once captured, the images may be stored in available memory on the communication device, and viewed on a display provided on the communication device. However, the available memory on the communication device may be limited, and a user may not be able to capture and store new images in the communication device without deleting images or other files already stored in memory. As well, while the user may enjoy the images on the communication device, the user may want to share the images with other users. However, there may be carrier network restrictions on transmission bandwidth. Also, if the images are to be shared, the ability to easily add descriptive information and location information about the images may be desirable.  What is needed is an improved system and method for resizing images prior to upload."  Exhibit F ('698 Patent) at 1:21-37.

94.    The '698 Patent addressed these problems by "[i]n an embodiment, a user may resize an image on the communication device 100 prior to uploading to save bandwidth and

memory space." Exhibit F ('698 Patent) at 6:14-16. "[i]n order to upload and share images with others, the default image may need to be resized prior to upload." Exhibit F ('698 Patent) at 6:24-26. "[i]n another embodiment, the EXIF data may be updated to include the pixel dimensions of the resized image. For example, if one of the "small" or "medium" sizes specified above is selected, then the new size of the image may be used to replace the original pixel size. The updated EXIF data may then be inserted into the resized image, and the resized image may be made available for viewing, or upload to an Image Repository 360." Exhibit F ('698 Patent) at 7:11-18 "At block 514, method 500 may proceed to resize the original image to an image of different size based on the selected default file size (e.g. small, medium), or based on a custom file size select by the user, and output a newly resized image file." Exhibit F ('698 Patent) at 7:25-29.

95.    Canon has been on notice of the '698 Patent and a specific factual basis for its infringement of the '698 Patent since at least the filing of this complaint.

96.    Defendants have, under 35 U.S.C. § 271(a), directly infringed, and continue to directly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claims 1 and 6 of the '698 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software including the Canon EOS R/DSLR series cameras, EOS M series cameras, and Powershot series cameras identified in Exhibit L.  An exemplary claim chart concerning one way in which Canon infringes claims 1 and 6 of the '698 Patent is attached as Exhibit L.

97.    Canon has, under 35 U.S.C. § 271(a), indirectly infringed, and continues to indirectly infringe, literally and/or under the doctrine of equivalents, one or more claims, including without limitation at least claim 1 of the '698 Patent, by making, using, testing, selling, offering for sale, and/or importing hardware and/or software such as the Canon EOS R/DSLR series

cameras, EOS M series cameras, and Powershot series cameras. An exemplary claim chart concerning one way in which Canon infringed claim 1 of the '698 Patent is attached as Exhibit L.

98.    Canon has also indirectly infringed, and continues to indirectly infringe, the '698 Patent under 35 U.S.C. § 271(b) and (c).

99.    Canon has knowingly, intentionally actively aided, abetted, and induced others to directly infringe at least claim 1 of the '698 Patent, and continues to do so. Defendants knowingly, intentionally, and actively aided, abetted, and induced others to directly infringe at least claim 1 of the '698 Patent by, for example, having sold, offered for sale, and encouraged customers to use at least some or all of the Accused Products. Defendants for example, provide instructions on how to access and use the infringing features. *See* https://cam.start.canon/en/C015/manual/html/UG-07_Playback_0210.html *see also* Exhibit L.

100.    Canon's infringement has been willful in view of the above and its failure to take any action, even after being put on notice, to stop its infringement or inducement of, or contribution to, infringement by others.

## **PRAYER FOR RELIEF**

WHEREFORE, Malikie and KPI pray for judgment against Canon as follows:

101.    That Canon has infringed and will continue to infringe each of the Asserted Patents unless enjoined;

A.    That Canon's infringement of the Asserted Patents has been willful, and its ongoing infringement of the Asserted Patents is willful;

B.    That Canon pay Malikie and KPI damages adequate to compensate for its past infringement of each of the Asserted Patents, as well as present and future infringement, together with interest and costs under 35 U.S.C. § 284;

C.      That Canon pay prejudgment and post-judgment interest on the damages assessed;

D.      That Canon pay Malikie and KPI enhanced damages pursuant to 35 U.S.C. § 284;

E.      That Canon be ordered to pay ongoing royalties to Malikie and KPI for any post-judgment infringement of the Asserted Patents;

F.      That this is an exceptional case under 35 U.S.C. § 285; and that Canon pay Malikie and KPI's attorneys' fees and costs in this action; and

G.      That Malikie and KPI be awarded such other and further relief, including equitable relief, as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38(b), Malikie and KPI hereby demands a trial by jury on all issues triable to a jury.

Respectfully submitted,

*/s/ Mark D. Siegmund*
Khue V. Hoang (*pro hac vice* forthcoming)
Patrick Colsher
Reichman Jorgensen Lehman & Feldberg LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
Tel: (212) 381-1965
khoang@reichmanjorgensen.com
pcolsher@reichmanjorgensen.com

Matthew G. Berkowitz (*pro hac vice* forthcoming)
Aaron Morris (*pro hac vice* forthcoming)
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
Tel: (650) 623-1401
mberkowitz@reichmanjorgensen.com
amorris@reichmanjorgensen.com

Naveed Hasan (*pro hac vice* forthcoming)
Reichman Jorgensen Lehman & Feldberg LLP
1909 K Street, NW, Suite 800
Washington, DC 20006
Tel: (202) 894-7310
nhasan@reichmanjorgensen.com

Of Counsel:

Mark D. Siegmund (State Bar No. 24117055)
**CHERRY JOHNSON SIEGMUND JAMES
PC**
Bridgeview Center
7901 Fish Pond Road, 2nd Floor
Waco, Texas 76710
Tel: (254) 732-2242
Fax: (866) 627-3509
msiegmund@cjsjlaw.com


*Attorneys for Plaintiffs Malikie Innovations Ltd.
and Key Patent Innovations Ltd.*